## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CLIFF WAGENKNECHT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03 C 8021 |
| | ) | |
| VILLAGE MOTORS, LLC, d/b/a | ) | Judge Rebecca R. Pallmeyer |
| LIBERTYVILLE TOYOTA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

On September 6, 2002, Plaintiff Cliff Wagenknecht was released from his employment with

Defendant Village Motors, LLC d/b/a Libertyville Toyota (hereinafter, "Toyota," or "dealership,")

after a foot condition and its treatment resulted in an extended absence from his position as an

Assistant Service Manager. Following his termination, Wagenknecht brought suit against Toyota,

alleging discriminatory and retaliatory discharge in violation of the Americans with Disabilities Act

of 1990, 42 U.S.C. § 12101, *et seq.* (hereinafter, "ADA").

Toyota now moves for summary judgment on both the discriminatory and retaliatory

discharge claims. For the reasons given below, the court grants Defendant's motion.

## STATEMENT OF FACTS

Defendant operates a car dealership in Libertyville, Illinois.[1]  (Def.'s 56.1(a) ¶ 1.)

---

[1]       The facts are presented in the parties' statements pursuant to Local Rule 56.1.
Defendant's Statement of Undisputed Material Facts is cited as "Def.'s 56.1(a) ¶ __"; Plaintiff's
Response is cited as "Plaintiff's Response ¶ __"; Plaintiff's Statement of Additional Facts is cited as
"Pltf.'s 56.1(b)(3)(B) ¶ __"; and Defendant's Response is cited as "Def.'s Response ¶ __."
Where either party denies only the materiality of the opposing party's statement, claims it
is irrelevant, or makes a general denial of facts without offering citation to the record, the court will
(continued...)

AutoNation, Inc. is the parent corporation of Libertyville Toyota.  (*Id.* at ¶ 3.)

**Wagenknecht's Job Duties and Foot Condition**

Toyota hired Wagenknecht as an Assistant Service Manager (hereinafter, "ASM,") in March 1996.  (Def.'s 56.1(a) ¶ 6.)  Parts and Service Manager Ben Mennella supervised Wagenknecht in this capacity.  (*Id.* at ¶ 7.)  As an ASM, Wagenknecht assisted customers who needed service on their vehicles and managed a team of four or five service technicians.  (*Id.* at ¶ 8.)  The manner in which Toyota required Wagenknecht to provide customer service is called "active service" and was something Toyota trained Wagenknecht and its other ASMs to do.  (*Id.* at ¶10.)  The "active service" routine consisted of:

- greeting the customer at the vehicle or in the service area;
- obtaining the current mileage and other information about the vehicle;
- inspecting the vehicle to determine the problem;
- preparing and printing a work order for the customer's signature;
- providing the work order to the leader of the ASM's team of technicians;
- test driving or inspecting the vehicle when the service work was completed;
- talking to the customer about the completed work; and
- directing the customer to the cashier and their vehicle.

(*Id.* at ¶ 9.)  Wagenknecht generally took approximately fifty customers through this "active service" routine each day.  (*Id.*)  Wagenknecht testified that the amount of time he might spend standing or walking to guide any particular customer through all of these steps was highly variable.  (Wagenknecht Dep., at 17.)  On the low end, the process might take only sixty seconds, but for other customers, the "active service" routine might require, in rare instances, over four hours of

---

[1]      (...continued)

deem the response an admission for the purpose of determining the existence of genuine and material disputes of fact. *Ammons v. Aramark Unif. Servs*, 368 F.3d 809, 817-18 (7th Cir. 2004). Where Plaintiff has offered support for his denials or for additional statements of fact, his version is credited for the purpose of deciding this motion.

standing or walking with a single customer. (*Id.* at 17-24.) Additionally, Wagenknecht could spend as little as a few minutes to well over an hour a day standing and walking while performing various other duties related to his position as an ASM, such as checking on parts for a vehicle, retrieving a customer's car from the parking lot, or going to the dealership's showrooms.[2] (*Id.* at 25-31.)

In April 2001, Dr. Kent DiNucci, Wagenknecht's podiatrist, diagnosed Wagenknecht with hammertoe and stress fractures on his right foot. (Def.'s 56.1(a) ¶ 13.) Dr. DiNucci also determined that Wagenknecht had an extended second metatarsal in the left foot, which had damaged Wagenknecht's plantar plate. (*Id.* at ¶ 14.) On approximately May 1, 2001, Wagenknecht went to work with a walking cast on his right foot and told Mennella that he was having problems with his feet.[3] (*Id.* at ¶ 15.) Over the next couple days, Wagenknecht, Mennella, and President and General Manager Kevin Keefe had discussions regarding limiting Wagenknecht's walking and standing at work. (*Id.* at ¶¶ 2, 16.) Specifically, Wagenknecht testifies that on May 2, 2001, he asked Mennella if he could move to a desk closer to the printer and have a two-way radio with which to communicate with his team of service technicians. (Wagenknecht Dep., at 76.) Wagenknecht reports that Mennella denied these requests and told him, "We all have to work with pain, get back out there." (*Id.* at 76-77.) Manella testified he was taken off-guard and did not appreciate the

---

[2]     Specifically, Wagenknecht testified that a round trip to the printer would take him ten seconds and a trip to see his technicians would take him thirty seconds. (Wagenknecht Dep., at 18-20.) The amount of time Wagenknecht spent standing and walking with respect to these two particular tasks is important in light of Wagenknecht's requests for accommodation, discussed below.

[3]     The parties agree to the date of May 1, 2001, however, the court's own examination of the record leads the court to believe that Wagenknecht received the walking cast at an evening doctor's appointment on May 1, 2001, and therefore did not report to work wearing the cast until "the next day," i.e. May 2, 2001. (Wagenknecht Dep. at 74-75, 107; Mennella Dep. at 27.)

3

seriousness of Wagenknecht's condition.[4]  (Mennella Dep., at 19.)  Nonetheless, Wagenknecht reduced his walking and standing at work by 75 percent, and still calculated (using a pedometer) that he was walking about a mile and a half a day.  (Def.'s 56.1(a) ¶¶ 17-18.)

There is a factual dispute as to when, but Wagenknecht eventually met with Keefe.[5]  Keefe moved Wagenknecht to another desk that was not in fact closer to the printer, but was the only unoccupied desk available, and other Toyota employees in the area agreed to deliver Wagenknecht's printouts.  (Wagenknecht Dep., at 92-94; Keefe Dep., at 57-58; Mennella Dep., at 24-25.)  Keefe testified that the dealership did not have any two-way radios, but did ask Wagenknecht's service technicians to walk back to Wagenknecht's desk every fifteen minutes so that Wagenknecht would not have to walk out to them.  (Keefe Dep., at 17-18.)  Keefe eventually gave Wagenknecht a one-way radio, but Wagenknecht complained that a one-way radio wouldn't really eliminate his need to move and that he would need a second radio.  (Wagenknecht Dep., at 92-93.)  Later, on the same day that Wagenknecht met with Keefe, Keefe did obtain a second radio, but it did not work.  (*Id.* at 97-98.)  Keefe indicated that he would keep trying to find something that would be accommodating.  (*Id.*)

Wagenknecht tried to remain at work for the rest of the day, but by 4:30 p.m., he was in too

---

[4]    This is not the last time, according to Plaintiff, that Mennella displayed a callous attitude. Wagenknecht testified that several months into his leave of absence, in September 2001, he returned to the dealership to have his car serviced. (Wagenknecht Dep., at 203.) When Mennella observed Wagenknecht's temporary handicapped license plate sticker, Wagenknecht recalls he said, "I can't believe they gave you one of these things," and "flipped" the sticker over on the passenger seat. (*Id.*)

[5]    Mennella testified that the meeting with Keefe took place on the next day, (Mennella Dep., at 19-20,) while Wagenknecht testifies that it was the next week, (Wagenknecht Dep., at 91). In Mennella's version of events, he was also present at this meeting. (Mennella Dep., at 20.)

4

much pain and left two and a half hours before his shift was scheduled to end. (*Id.* at 98.) There is a factual dispute as to whether he notified anyone that he was leaving. Wagenknecht testifies that he did, (*id.*,) but Keefe says he did not. (Keefe Aff. ¶ 3.) This is the last day Wagenknecht would ever report to the dealership for work.

**Wagenknecht's Extended Leave of Absence**

On or about May 7, 2001, Toyota received a letter from Dr. DiNucci stating that Wagenknecht could not engage in excessive ambulation or activity on his feet.[6] (Def.'s 56.1(a) ¶ 21.) Two weeks later, on approximately May 21, 2001, Toyota received another letter from Dr. DiNucci stating that Wagenknecht had surgery on his right foot on May 15 and that he could be on his feet for only one hour per day. (*Id.* at ¶ 22.) Around this time, Wagenknecht applied for and began receiving short-term disability benefits from UNUM Provident. (*Id.* at ¶ 23.) In order to receive benefits, Wagenknecht and his doctor certified that Wagenknecht was unable to perform the material duties of his regular occupation. (*Id.* at ¶ 24.) During Wagenknecht's absence, Ryan Snider filled in at the dealership as an ASM. (*Id.* at ¶ 25.) On July 10, 2001, Wagenknecht had surgery on his left foot. (*Id.* at ¶ 26.) Toyota received a note from Dr. DiNucci dated August 27, 2001, stating that Wagenknecht could not return to work due to complications in his recovery. (*Id.* at ¶ 27.) In September 2001, Toyota permanently assigned Snider to fill Wagenknecht's position. (*Id.* at ¶ 28.)

**Service Coordinator**

On or about January 14, 2002, Toyota received a note from Dr. DiNucci stating:

---

[6] In light of the factual dispute mentioned in the previous note, there is a possibility that Toyota received this note before Wagenknecht met with Keefe.

"[Wagenknecht] is not . . . able to work on his feet all day long yet. His condition is increasing everyday and . . . at the end of the month I would be able to give you a better idea of what his status would be at that time." (*Id.* at ¶ 29.) On February 5, 2002, Toyota held a meeting regarding its insurance benefits. (Wagenknecht Dep., at 218.) Wagenknecht attended this meeting. (Def.'s 56.1(a) ¶ 31.) Based on the latest note from Dr. DiNucci and Keefe's observation of Wagenknecht's mobility at the meeting, Keefe wanted to give Wagenknecht the opportunity to return to work and believed that he would be appropriate for a soon-to-be-created Service Coordinator position because the job called on many of the areas in which an ASM has experience, but could be done entirely from a desk. (*Id.* at ¶¶ 30-34.)

On approximately February 16, 2002, Mennella met with Wagenknecht to offer him the Service Coordinator position, explaining that it would be appropriate because it required minimal walking or standing. (*Id.* at ¶ 38.) The new position would pay $35,000–less than Wagenknecht's salary as an ASM–but after speaking with Wagenknecht's insurance representative, Mennella arranged for Wagenknecht's disability insurance to cover the difference between the Service Coordinator salary and the ASM salary as a work incentive without sacrificing continued coverage. (*Id.* at ¶¶ 37, 39; Pltf.'s 56.1(b)(3)(B) ¶ 7.) Mennella also told Wagenknecht that his ASM position had been filled, but assured him that if he was medically capable, he could return to an ASM position within the next six to nine months when the dealership expanded the service bays and hired more technicians. (Def.'s 56.1(a) ¶¶ 35, 40.) Wagenknecht testified that he told Mennella, "I'd be interested in [the Service Coordinator position] because I was, you know, fearful for my job, and [Mennella] said he would contact me with further information of when I'd be starting." (Wagenknecht Dep., at 228.) Plaintiff explained that he believed that if he did not accept the

6

Service Coordinator Position, Toyota would "have reason to terminate me." (Wagenknecht Dep., at 230.) He testified that he felt apprehensive taking the Service Coordinator's position because he thought Mennella was setting him up to fail in the long run. (Pltf.'s 56.1(b)(3)(B) ¶ 8; Wagenknecht Dep., at 223-24.) Nevertheless, a couple of days later, Wagenknecht called Mennella and accepted the position, agreeing to a starting date of March 12, 2002. (Def.'s 56.1(a) ¶ 42; Wagenknecht Dep., at 229-30; Mennella Dep, at 52.) After this conversation, Toyota began making preparations for Wagenknecht's new position, including building a new office for him and preparing a brochure with his name on it. (Def.'s 56.1(a) ¶ 43.)

On March 11, 2002, the day before his scheduled starting date, Wagenknecht called Mennella and stated that he would not be returning to work as planned. (*Id.* at ¶ 44.) According to Plaintiff, Wagenknecht advised Mennella that he would still need to take time off for medical reasons, and that he believed that it would be unfair to both Mennella and himself if he returned to work at that time.[7] (Plaintiff's Response ¶ 44.) In a note dated March 18, 2002, Dr. DiNucci recommended that Wagenknecht be restricted to a desk job. (Def.'s 56.1(a) ¶ 45.) On March 20, Mennella received a letter from an attorney for Wagenknecht, advising Toyota that Wagenknecht could not return to work in his medical state; that Wagenknecht would be seeking additional

---

[7] Wagenknecht testified that he felt that he was being set up to fail in the Service Coordinator's position and that the best solution for him "was to deny the job that [Mennella] had offered and wait for the original [ASM] position that [Mennella] said was going to be available once the shop got expanded six to nine months down the road." (Wagenknecht Dep., at 231.) Wagenknecht, however, did not tell Mennella this during their March 11, 2002 phone call. (*Id.*) Instead, Wagenknecht made reference to his medical condition and need for further medical evaluations. (*Id.*) Moreover, Wagenknecht does not explain, either to Mennella or this court, why he believed he would be more successful in the more physically-challenging position than in a position tailored to his physical limitations.

7

medical evaluations; and that Toyota should direct all further communications with Wagenknecht through counsel. (*Id.* at ¶ 46; Letter of 3/20/02 by Graft, Jordan & Curtis, Attorneys at Law, Def. Ex. 19.)

**The Discharge**

On approximately August 5, 2002, Dr. DiNucci completed a functional abilities form for UNUM in which he stated that Wagenknecht could perform only eight hours of sedentary activity and recommended that Wagenknecht be restricted to a job that did not require standing or walking. (Def.'s 56.1(a) ¶ 48.) Dr. DiNucci also noted that he did not expect a change in Wagenknecht's status for the foreseeable future. (*Id.* at ¶ 49.) Toyota received a letter from Dr. DiNucci dated August 8, 2002, again recommending that Wagenknecht be restricted to a desk job with only twenty minutes of walking each day, or if returning to an ASM position, that Wagenknecht should use a walker. (*Id.* at ¶¶ 50-51.) Based on the letter, Keefe asked Michael Levesque—the Human Resources Director for AutoNation—and Mennella to schedule a meeting with Wagenknecht to once again discuss his ability to return to work. (*Id.* at ¶¶ 4, 52.) Although the dealership still did not have an available ASM position, Keefe had held the newly-created Service Coordinator position open for Wagenknecht. (*Id.* at ¶ 53.)

Levesque, Mennella, and Wagenknecht met on August 22, 2002, at the dealership. (*Id.* at ¶ 54.) After being asked why he rejected the Service Coordinator position offered in February 2002, Wagenknecht responded that he thought he "would fail in it." (*Id.* at ¶¶ 55-56.) He also explained that he rejected the position because his attorney advised him to do so. (*Id.* at ¶ 57; Mennella Dep., at 63.) Levesque asked Wagenknecht why he felt threatened, why he was using words like "discrimination" and "retaliation," and why he felt he needed a lawyer. (Def.'s 56.1(a) ¶ 58; Pltf.'s

56.1(b)(3)(B) ¶¶ 9, 10; Wagenknecht Dep., at 260.) Mennella testified that Wagenknecht said that he could not respond to the last question.[8] (Mennella Dep., at 65.) Ultimately, either at Levesque's suggestion (admitted by Plaintiff, Def.'s 56.1(a) ¶ 59; Plaintiff's Response ¶ 59,) or at Wagenknecht's request (as he testified, Wagenknecht Dep., at 260), Wagenknecht's lawyer was briefly included in the conversation via telephone. (Def.'s 56.1(a) ¶ 59.) Further, there is a dispute of fact as to whether Wagenknecht was re-offered the Service Coordinator position at this meeting. Wagenknecht testifies that he was not, (Wagenknecht Dep., at 261,) while Mennella testifies that he was.[9] (Mennella Dep., at 62, 65.) It is undisputed that the meeting ended without any discussion of Wagenknecht's medical condition, and Levesque told Wagenknecht that Toyota would review his work situation and contact him. (Def.'s 56.1(a) ¶ 60; Pltf.'s 56.1(b)(3)(B) ¶ 11.)

Keefe testified that following this meeting, Levesque recommended to him that Wagenknecht be terminated for job abandonment.[10] (Def.'s 56.1(a) ¶ 61.) Keefe agreed and testified that he decided to discharge Wagenknecht because Wagenknecht had agreed to take the

---

[8] The record does not include Wagenknecht's responses to the first two questions.

[9] Wagenknecht's lawyer has not weighed in on the question and neither party seems to have asked him. In fact, the record contains no information about, what if anything, Wagenknecht's lawyer said during the August 22, 2002 meeting.

[10] Plaintiff calls this a mischaracterization of the evidence, (Plaintiff's Response ¶ 61,) but he cites only wholly irrelevant portions of his own deposition transcript: his testimony regarding the August 22, 2002 meeting with Levesque and Mennella; Mennella's subsequent phone call to Wagenknecht to inform him that he had been terminated; and Wagenknecht's assertion that he could have performed as an ASM with the accommodation of a desk closer to the printer and a two-way radio. (Wagenknecht Dep., at 261-64.) Plaintiff also cites his own testimony that he did not believe he was terminated at the August 22, 2002 meeting. (*Id.* at 319-20.)

Service Coordinator position in February 2002 and then never came to work.[11]  (*Id.* at ¶ 62; Keefe Dep., at 36-37.)  Keefe asked Mennella to inform Wagenknecht that he had been terminated for job abandonment, and Mennella did so on approximately September 6, 2002.  (Def.'s 56.1(a) ¶ 64.)

Keefe terminated Wagenknecht as part of his "ultimate decision-making authority" at Toyota.  (*Id.* at ¶ 2.)  Plaintiff disputes the claim that Keefe is the ultimate decision maker at Toyota, (Plaintiff's Response ¶ 2), but Keefe testified at his deposition that he was "responsible for all employees," and made "decisions regarding hiring and firing" generally, and regarding Wagenknecht's termination in particular.  (Keefe Dep., at 12-13.)  Plaintiff notes that Keefe also testified that Levesque recommended that Wagenknecht be terminated, but in the same sentence Keefe states, "I made the final decision to terminate him."  (*Id.* at 36.)  Keefe responded in the affirmative to the question, "Do you hold the ultimate decision in hiring and firing?" and observed that he would occasionally give prior notice of his personnel decisions to Levesque, although he was not required to do so.  (*Id.* at 28-29.)  It is undisputed that Levesque "had no direct authority over personnel decisions within the dealerships." (Def.'s 56.1(a) ¶ 4; Plaintiff's Response ¶ 4.)  That some other supervisor actually conveyed Keefe's decision to Wagenknecht at Keefe's request, (Keefe Dep., at 38,) does not raise a genuine dispute of fact regarding Keefe's status as the ultimate decision-maker for Defendant.  Nor does Plaintiff's testimony that this same messenger/supervisor had

---

[11]      Plaintiff has the same objection to this 56.1(a) statement and cites the same inapposite passages from Wagenknecht's deposition. (Plaintiff's Response ¶ 62.) That said, Wagenknecht's testimony does indicate that he believes he was never re-offered the position of Service Coordinator at the August 22, 2002 meeting, (Wagenknecht Dep., at 319,) while the part of the record Defendant cites for its 56.1(a) statement that Keefe discharged Wagenknecht because he did not believe Wagenknecht was ever coming back to work, (Def.'s 56.1 ¶ 63,) is Keefe's testimony that Wagenknecht turned down the Service Coordinator position again at the August 22, 2002 meeting with Levesque and Mennella, (Keefe Dep., at 35-36.)

threatened to terminate Wagenknecht more than a year earlier cast doubt on Defendant's assertion

that Keefe made the termination decision. (Wagenknecht Dep., at 125-26.)

<u>PROCEDURAL HISTORY</u>

Plaintiff filed an initial complaint in this action on November 12, 2003, alleging at least three

claims under the ADA: (1) wrongful termination, (2) hostile environment, and (3) retaliation.[12]

Defendant moved to dismiss the complaint for failing to allege that Wagenknecht had a disability.

On August 12, 2004, this court dismissed Plaintiff's hostile environment and (to the extent that

Plaintiff raised it) failure to accommodate claims as untimely, but gave Plaintiff leave to amend the

complaint to allege Wagenknecht's disability. Plaintiff filed an amended complaint on September 3,

2004. On November 1, 2004, the court struck allegations related to Plaintiff's hostile environment

and failure to accommodate claims, leaving a claim for wrongful termination and a claim for

retaliation. Defendant filed an amended answer eighteen days later.

Defendant now moves for summary judgment on both remaining claims.

<u>DISCUSSION</u>

The ADA states:

> No covered entity shall discriminate against a qualified individual with a disability
> because of the disability of such individual in regard to job application procedures,
> the hiring, advancement, or discharge of employees, employee compensation, job
> training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). In order to establish a wrongful termination claim under the ADA, Plaintiff

must show that: (1) he is disabled within the meaning of the ADA; (2) he is qualified to perform the

---

[12]     The parties also seem to believe that the complaint included a claim for failure to
accommodate, although the court does not share this opinion.

essential functions of the job, either with or without reasonable accommodation; and (3) he suffered an adverse employment action because of that disability. *Nese v. Julian Nordic Constr. Co.*, 405 F.3d 638, 641 (7th Cir. 2005). A retaliation claim under the ADA requires Plaintiff to show that: (1) he engaged in statutorily protected expression; (2) he suffered an adverse action; and (3) there is a causal link between the protected expression and the adverse action. *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1117 (7th Cir. 2001). To avoid summary judgment, Plaintiff must demonstrate that there is a genuine issue of material fact as to one or both of his claims. *Kupstas v. City of Greenwood*, 398 F.3d 609, 611 (7th Cir. 2005); *see also* FED. R. CIV. P. 56(c). The court draws all reasonable inferences in Plaintiff's favor. *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 796 (7th Cir. 2005); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

With respect to the wrongful termination claim, Defendant argues that Plaintiff was not qualified at the time of his termination for the position of an ASM, cannot show that job abandonment was a pretext for a prohibited discriminatory motive, and was not disabled. (Defendant's Brief in Support of Its Summary Judgment Motion (hereinafter, "Def.'s Mem."), at 1.) With respect to the retaliation claim, Defendant argues that Plaintiff did not engage in any protected activity and has not identified any evidence suggesting retaliatory animus. (*Id.* at 2.) The court addresses each argument in turn.

**A.     Wrongful Termination**[13]

**1.     Plaintiff's qualification for the ASM position**

A person is qualified under the ADA where he "can perform the essential functions of the employment position that such individual holds" with or without reasonable accommodation. 42 U.S.C. § 12111(8); *see also Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 380 (7th Cir. 2003). Plaintiff bears the burden of proof on this issue. *E.E.O.C. v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 948 (7th Cir. 2001).

Defendant argues that Plaintiff cannot show that he is qualified for the position of an ASM because Plaintiff's limited mobility prevents him from providing the essential function of "active service." (Def.'s Mem., at 9.) The record reflects that even after receiving some of the accommodations Plaintiff had requested–several one-way radios, a desk change and assistance receiving printouts, as well as having his service technicians come to him rather than requiring him to find them–he was unable to complete an entire shift due to pain. (Wagenknecht Dep., at 92-94, 97-98.) Furthermore, Defendant argues, had Plaintiff received all of the accommodations he had requested (a desk next to the printer and a two-way radio), he would have saved only minutes of walking and standing, certainly not enough time to put Plaintiff in the 20-minutes-of-walking-or-standing window Dr. DiNucci deemed safe in his August 8, 2002 letter regarding Wagenknecht's medical condition. (*Id.* at 9-10.)

---

[13]     The parties have briefed the issue of whether Wagenknecht's foot injuries constitute a disability under the ADA. (Def.'s Mem., at 7-9; Pltf.'s Mem., at 4-5; Def.'s Reply, at 2-4.) The court need not resolve this issue because Plaintiff is unable to raise material disputes of fact with respect to any of the other elements necessary to prevent summary judgment with respect to his discrimination claim.

Dr. DiNucci's letter of August 8, 2002, however, does suggest that Wagenknecht might have been able to fulfill his duties as an ASM with a walker. (Letter of 8/8/02 by Liberty Ankle & Foot Clinic, Def. Ex. 22.) Notably, by August 8, 2002, the ASM position was no longer available, having been filled, on a permanent basis, by Ryan Snider in Wagenknecht's extended absence. (Def.'s 56.1(a) ¶ 28.) *See also Jackson v. City of Chicago*, 414 F.3d 806, 912-13 (7th Cir. 2005) (To meet the requirement of accommodation, an employer "may be required to reassign a disabled employee to a vacant position if the employee no longer can perform the essential function of the job she holds," but "the employer is not required to 'manufacture a job that will enable the disabled worker to work despite his disability.'") During the months before Toyota reassigned Snider to Wagenknecht's ASM position on a permanent basis, Dr. DiNucci's letters stated that Wagenknecht could not return to work, even with accommodations. (Letter of 8/27/01 by Liberty Ankle & Foot Clinic, Def. Ex. 14.)

The court concludes that Plaintiff has not identified any genuine dispute of material fact on the question of whether Wagenknecht was qualified for the position of an ASM.[14] Plaintiff's naked

---

[14] Defendant also argues that Plaintiff should be estopped from even arguing that Wagenknecht was qualified for the position of an ASM because Wagenknecht and his doctor certified to Wagenknecht's disability insurance provider that Wagenknecht was not qualified to return to work on several occasions. (Defendant's Brief in Support of Its Summary Judgment Motion (hereinafter, "Def.'s Mem."), at 10.) Defendant cites *Opsteen v. Keller Structures, Inc.*, 408 F.3d 390 (7th Cir. 2005), in support of this position. (Def.'s Mem., at 10.)

In *Opsteen*, the Seventh Circuit affirmed a district court's decision to preclude a plaintiff from contending that he was qualified for a job where the plaintiff had "applied for and received disability benefits under both the Social Security program and his employer's ERISA plan," based on assertions that "he was totally and permanently disabled from performing his former job . . . or indeed any other gainful employment." 408 F.3d at 391. The *Opsteen* court stated, "a person who applied for disability benefits must live with the factual representations made to obtain them, and if these show inability to do the job then an ADA claim may be rejected without further inquiry." *Id.* at 392 (referring to *Cleveland v. Policy Mgmt. Sys., Corp.*, 526 U.S. 795 (1999)).

Rather than providing any arguments on why Plaintiff was qualified for the ASM position,
(continued...)

14

assertion to the contrary in his opposition brief is insufficient to preclude this conclusion. (Plaintiff's Memorandum in Opposition to Defendant's Summary Judgment Motion (hereinafter, "Pltf.'s Mem."), at 6.) Plaintiff's Response to Defendant's 56.1(a) Statement of Undisputed Material Facts admits every fact upon which this court bases its finding. Plaintiff's 56.1(b)(3)(B) Statement of Additional Facts only reiterates undisputed details such as accommodations Plaintiff requested and received and what questions were and were not asked of Plaintiff at the August 22, 2002 meeting with Levesque and Mennella. There are no disputes of material fact concerning these issues.

## 2. Defendant's motivation in terminating Plaintiff

Defendant contends that the undisputed facts show Toyota terminated Wagenknecht because he abandoned the Service Coordinator job in March 2002—a position that he had accepted in February 2002. (Defendant's Reply Brief in Support of Its Summary Judgment Motion (hereinafter, "Def.'s Reply"), at 5-6.) Plaintiff notes that Wagenknecht was not fired on March 12, 2002, the day he allegedly abandoned the Service Coordinator position, but only after the August 22, 2002 meeting in which Levesque asked Wagenknecht why he felt that he needed a lawyer. (Pltf.'s Mem., at 7.) Plaintiff argues that job abandonment was, in fact, a pretext for a discriminatory motive, (*id.*), but Plaintiff offers no evidence that links his discharge with his alleged disability.

---

[14]     (...continued)
Plaintiff dedicates his entire brief to arguments pertaining to why he should not be estopped from arguing that he was qualified. (Plaintiff's Memorandum in Opposition to Defendant's Summary Judgment Motion (hereinafter, "Pltf.'s Mem.," at 6.) Plaintiff contends that Wagenknecht was forced to take disability because Defendant did not provide him with requested accommodations. (*Id.*) Plaintiff also argues that *Opsteen* is distinguishable because this case involves private insurance while the insurance in *Opsteen* came from the Social Security Administration. (*Id.*) The court would suggest that the facts of this case and *Opsteen* support neither of Plaintiff's assertions, but in light of the conclusion that no genuine dispute of fact exists in the record as to Plaintiff's lack of qualification for the ASM position, finds no reason to make a ruling on the question of estoppel.

Instead, Plaintiff suggests that Wagenknecht could not have been discharged for abandoning the Service Coordinator position because he never accepted the job in the first place. (*Id*.) Plaintiff points to Wagenknecht's testimony that on March 11, 2002, Wagenknecht decided that the safest course of action would be to deny the Service Coordinator position, in which he felt that he was being set up to fail, and instead wait for a new ASM position to open. (Wagenknecht Dep., at 231.) Wagenknecht acknowledged, however, that he did not share these beliefs with Mennella during the March 11, 2002 phone call, instead telling Mennella that he would not report to work because of his ongoing need for medical evaluation. (*Id*.) Moreover, Plaintiff admitted Defendant's 56.1(a) statement that he accepted the Service Coordinator position in February 2002. (Plaintiff's Response ¶ 42.) Wagenknecht's acceptance of the Service Coordinator position, therefore, is an uncontested material fact.

Plaintiff's second argument is that it is implausible that Defendant discharged him for job abandonment a full five months after the abandonment. (Pltf.'s Mem., at 7.) Wagenknecht infers that if job abandonment is the true reason for his termination, then Toyota would have discharged him much earlier. The court observes that Wagenknecht's disability came to Toyota's attention long before Wagenknecht's apparent job abandonment–as early as May 1, 2001. A fundamental difficulty for Plaintiff in establishing any inference that Toyota had it out for disabled employees is that there is no evidence in the record of any such animus.[15] Instead, the record demonstrates that when it

---

[15] Mennella's callous attitude towards Wagenknecht's injuries in the form of Mennella's initial dismissive statements on the day Wagenknecht arrived at work wearing a walking cast and Mennella's later arguable hostility on the day Wagenknecht brought his car in to the dealership for service do not bolster his case. These two incidents took place a full year before Wagenknecht's discharge. In any event, the undisputed facts show that it was Keefe who made the decision to

(continued...)

became clear that Wagenknecht would be unable to perform in his previous position as an ASM, Toyota offered Wagenknecht the newly-created position of Service Coordinator, a position consistent with his medical limitations. (Def.'s 56.1(a) ¶¶ 29-35, 37-40, 42-44.) When Wagenknecht did not report for duty at the time that he had said he would, Toyota believed Wagenknecht had put off his start date for medical reasons–because that is what Wagenknecht told Defendant on March 11, 2002. (Wagenknecht Dep., at 231-32.) Wagenknecht was only terminated after the August 22, 2002 meeting made perfectly clear to Toyota that Wagenknecht's failure to report for duty on March 12, 2002 had nothing to do with Wagenknecht's medical situation, but was instead based on Wagenknecht's belief that taking the position would be bad for his career. (Def.'s 56.1(a) ¶¶ 55-56.) The court is inclined to see the five-month-plus delay between when Wagenknecht did not show up for his first day as the Service Coordinator and his September 2002 termination, not as evidence that Defendant wanted to treat Wagenknecht less well because of his disability, but if anything, as evidence that it had cut Wagenknecht more slack because of his disability.[16]

Unable to identify any evidence of Toyota's hostility towards disabled employees generally or to Plaintiff himself because of his disability, Plaintiff draws the court's attention to the fact that

---

[15]    (...continued)
terminate Wagenknecht, not Mennella. (Def.'s 56.1(a) ¶ 2.)

[16]    Plaintiff also notes that Defendant did not inquire into his medical condition at the August 22, 2002 meeting. (Pltf.'s Mem., at 7.) Defendant argues that Dr. DiNucci's August 2002 letter provided Toyota with all the information it needed about Plaintiff's medical condition at the time of the meeting. (Defendant's Reply Brief in Support of Its Summary Judgment Motion (hereinafter, "Def.'s Reply"), at 6.) In the court's view, Defendant's failure to ask about Plaintiff's well-documented medical condition is irrelevant.

at the August 22, 2002 meeting Levesque asked Wagenknecht why he had hired a lawyer. (Pltf.'s Mem., at 7.) To the extent this question reveals Defendant's true motivation in terminating Wagenknecht, it may be relevant to his retaliation claim, discussed below. It does not support a claim that Defendant terminated Wagenknecht because of his disability. No material disputes of fact prevent this court from granting Defendant's motion for summary judgment on that claim.

## B.    Retaliation Claim

The ADA's retaliation provision states: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Plaintiff has not suggested he can prove his claim under the direct method, instead making arguments in support of an "indirect method" case. *Isbell v. Allstate Ins. Co.*, 418 F.3d 788, 793 (7th Cir. 2005). As noted above, under the indirect method of proving retaliation under the ADA, Plaintiff could establish a *prima facie* case of retaliation by demonstrating that after engaging in protected activity, he was subjected to more adverse treatment by Toyota than similarly situated employees who did not engage in any protected activity. *Id.* Once Plaintiff does this, Defendant may offer evidence of a non-invidious reason for terminating Wagenknecht. *Mannie v. Potter*, 394 F.3d 977, 984 (7th Cir. 2005). If Defendant does so, Wagenknecht must demonstrate that Defendant's proffered reason is pretextual. *Id.* Causation is not a formal element of a claim for retaliation; Plaintiff need not show "even an attenuated causal link" between the termination and the protected conduct. *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 643-44 (7th Cir. 2002).

Although Plaintiff has not developed his claim with great clarity,[17] the court concludes that Plaintiff can establish a *prima facie* case for retaliation. Plaintiff identifies three actions he took as protected activities: (1) asking for a two-way radio and a desk reassignment, (2) complaining about disparate treatment, and (3) being terminated. (Pltf.'s Mem., at 9.) Defendant argues that none of these activities are protected, (Def.'s Mem., at 13), and is correct about two of them. First, being terminated is an adverse action; it is not itself a protected activity. Complaining about disparate treatment might be, but the record does not reveal that Plaintiff did in fact complain about disparate treatment. Plaintiff cites to two pages of his deposition as evidence, but at these pages Wagenknecht is recounting a conversation in which Mennella threatened to terminate him for leaving work without permission in May 2001. (Wagenknecht Dep., at 125-26.) There is no mention on these pages or anywhere else in the record of Wagenknecht's complaining of disparate treatment.

That leaves Plaintiff's request for accommodation. The court concludes this is protected activity. *Silk v. City of Chicago*, 194 F.3d 788, 799-801 (7th Cir. 1999). Moreover, although Plaintiff fails to argue the point, the court is inclined to find that retaining a lawyer in order to file a disability discrimination lawsuit is also protected activity.[18] *See, e.g., Ambers v. Village Family Serv. Center, Inc.*,

---

[17]       For instance, as Defendant is quick to note, Plaintiff has not presented any evidence related to similarly situated employees who Defendant treated more favorably than Wagenknecht. (Def.'s Reply, at 8.) The court will assume for purposes of this motion that Plaintiff contends that every ASM not terminated by Toyota is a similarly-situated employee treated more favorably, and to the extent that Plaintiff is not similarly situated, his differences arguably relate to his protected status.

[18]       Unfortunately, Plaintiff has failed to develop the record as to why he hired an attorney. Defendant argues that this court should not consider Plaintiff's retention of an attorney at all because it was not part of Plaintiff's E.E.O.C. charge. (Def.'s Mem., at 12.) Plaintiff urges that the E.E.O.C. charge ought to be broadly construed. (Pltf.'s Mem., at 8.) The court recognizes *Cheek*

(continued...)

329 F. Supp. 2d 1046, 1049 (D. N.D. 2004) (recognizing that such a theory may be viable, provided the attorney is retained to prosecute a discrimination claim and not simply for some other purpose). Defendant has, however, presented evidence of a legitimate, non-discriminatory reason for firing Wagenknecht: job abandonment. (Def.'s Mem., at 14.) Plaintiff has no evidence that this reason is pretextual. As noted earlier, Mennella was less than enthusiastic about providing Wagenknecht with accommodations initially and later allegedly expressed hostility towards Wagenknecht and his disability license plate sticker. These incidents occurred more than a year before Wagenknecht's termination, however, and are the acts of a person who did not make the actual decision to terminate Wagenknecht. In fact, Keefe, the ultimate decision maker, testified that Mennella was not even consulted about this decision beyond being told to convey the message to Wagenknecht. (Keefe Dep., at 36-37.) The court notes Levesque's questioning Wagenknecht's decision to retain an attorney, but the record reflects that this question was nothing more than an attempt to clarify why Wagenknecht had decided not to take the Service Coordinator position.

The court will draw all reasonable inferences in Plaintiff's favor, but Plaintiff has simply sat on his hands with respect to Defendant's motion for summary judgment on this claim. He offers no evidence concerning the treatment of any similarly-situated employees nor any other evidence, apart from an ambiguous question asked by a person who, like Mennella, did not even make the decision to terminate Wagenknecht. Plaintiff has raised no genuine material disputes of fact upon which a jury might find in its favor on his claim of retaliation.

---

[18]    (...continued)
*v. Western and Southern Life Ins. Co.*, 31 F.3d 497 (7th Cir. 1994), as providing the applicable test, but declines to resolve this issue as its resolution does not alter the court's underlying conclusion that Defendant's motion must be granted with respect to Plaintiff's retaliation claim as well.

## CONCLUSION

Defendant's motion for summary judgment (30) is granted with respect to both Plaintiff's wrongful termination and retaliation claims.

ENTER:

Dated: March 2, 2006

_____
REBECCA R. PALLMEYER
United States District Judge